SHELTON & TUTTLE, Trustees, *v.* GEORGE L. HURD.

The courts of law in Rhode Island take notice of, and give effect to, all equitable discharges of sureties, as far as legal remedies will permit, whether the surety-ship appear on the face of the instrument, or, not so appearing, is proved to exist in reality, so that it be known at the time of his acting in the matter, to the party to be affected by the discharge.

A prior endorser of a draft, who, to the knowledge of the plaintiffs, endorsed it for the accommodation of the next subsequent endorser, from whose endorsement the plaintiffs took title, was held discharged from the debt by the plaintiffs' surrender of the draft to the subsequent endorser, his principal; and this, notwithstanding the plaintiffs had recovered judgment for it against the first endorser at the time of such surrender.

The defence in such case is equally available against the judgment in the hands of any assignee of the same; who must take it subject to all equities between the parties to it, subsisting at the time of the assignment.

A surety was permitted to amend his pleadings so as to avail himself of an equitable discharge from a judgment; but upon the terms that he should recover no costs of the action.

DEBT upon a judgment, for the sum of $196.98 damages, and costs of suit taxed at $13.20, recovered by the plaintiffs against the defendant, at the September term of the Superior Court of the State of Connecticut, within and for the county of Litchfield, A. D. 1858.

Pleas, *nul tiel record*, and payment, upon which issues were joined. Upon the trial of the case before the court, to whom the parties submitted it, it was proved, that the defendant, as the agent of Messrs. L. B. Judson & Co., of New Haven, sold for

them, at Mobile, Alabama, a carriage to one Jerusha Wilson, and received, in payment therefor, on the 17th day of April, 1857, a bill of exchange, drawn by said Jerusha upon T. H. Wilson & Co., for the sum of $185.50, payable to the defendant or his order, on the 15th day of January, 1858, at the Bank of Mobile, in Alabama, which he endorsed over to his principals, and which they, before the maturity of said bill of exchange, endorsed over to the plaintiffs in part security for a considerable sum of money in which they were indebted to the plaintiffs ; that at the time they received said draft from L. B. Judson & Co., or about the time of the protest thereof, the plaintiffs learned that the defendant had acted, in receiving and endorsing the same, as the agent merely of L. B. Judson & Co. ; that said draft not being paid at maturity, the plaintiffs, on the 24th day of May, 1858, sued the defendant as the first endorser thereof, and on the second Tuesday of September, 1858, recovered against him, by default, the judgment upon which the present suit is brought ; that the plaintiffs had pending, at the time of said judgment, two actions in the Superior Court of Connecticut for the county of New Haven, against said L. B. Judson & Co., commenced by attachment of their stock of goods, for the recovery of debts due from said L. B. Judson & Co. to the plaintiffs, in which actions one Russell Chapman became receiptor to the sheriff for the goods attached, which goods remained with, and were disposed of by, said L. B. Judson & Co. ; that at the March term of said court, by arrangement, the plaintiffs took judgments against said L. B. Judson & Co. in said actions, for the sum of $3000, the payment of which, with costs of suit, was to be in full of all claims of the plaintiffs against L. B. Judson & Co.   The agreement, upon which the judgments were given, provided, that the plaintiffs were to hold the judgment against the defendant, Hurd, amongst other securities, as collateral security for the payment of the judgments against L. B. Judson & Co.; and that upon the payment of said judgments, Judson & Co. were to be entitled to receive back from the plaintiffs, with certain other securities left as collateral, the Hurd judgment.   It further appeared, that after obtaining judgment against Hurd, and pending the suits of the plaintiffs against L. B. Judson & Co., and with knowledge of Hurd's relation to L. B.

Judson & Co. on the draft upon which the judgment was obtained, the plaintiffs surrendered the draft itself to Judson & Co. without the assent or knowledge of Hurd, upon the notion, that they, the plaintiffs, had security enough for their debt without it. Judson & Co. not paying the judgments against them as arranged, the sheriff sued the receiptor, Chapman, upon his receipts, when he, in January, 1860, to discharge that liability, paid the amount of the judgments to the plaintiffs, and received from them an assignment of the securities held by them as collateral to the judgments, and, amongst others, this judgment against Hurd, the defendant; whereupon, Chapman commenced this suit against Hurd on the judgment in the name of the plaintiffs, as his trustees. It appeared that the plaintiffs, at the time, objected to delivering to Chapman these securities, including the judgment, without the consent of Judson & Co., but did so upon receiving from Chapman a bond of indemnity. The proof upon the point, whether Judson & Co. had consented that Chapman should receive these securities was conflicting; Chapman swearing that they had, and Lewis B. Judson, of the firm of Judson & Co., that they had not, but though frequently asked by Chapman for an order upon the plaintiffs for them, that they invariably refused to give it.

It was agreed, that the costs upon the judgment sued, had been paid into court here.

*Hart, for the plaintiffs.*

*Collins, with whom was T. A. Jenckes, for the defendant.*

AMES, C. J. It is quite too late to discuss the question here, whether he who really stands upon a bill or note in the relation of a surety, or *quasi* surety, to another party to the same, though not in a position on the paper to signify it, so that the true relation be known to the holder of the paper, may not avail himself, both at law and in equity, of every equitable discharge which properly grows out of that relation. In accordance with the weight of decision, the doctrines of equity upon this subject have long been naturalized, as it were, in our courts of law, and been administered by them as far as legal remedies would permit. *Hidden* v. *Bishop*, 5 R. I. Rep. 29, 32.

The bill of exchange, upon which the judgment sued was founded, was received by the defendant as security for the price

of a carriage sold by him as agent for L. B. Judson & Co., and was made payable to him, as a mode merely of transferring the security to them, as his principals. With the knowledge of this, either at the time when they received the bill, or about the time when it was protested, the plaintiffs first obtained this judgment upon it against the defendant, and then, without his knowledge or assent, surrendered the bill of exchange to Judson & Co., for the reason, as one of the plaintiffs expresses it, that they had security enough for Judson & Co.'s debts, for which this bill was held as collateral security only, without *their* liability, or that of the drawer or acceptor, upon it. By this surrender, the plaintiffs'·title to the bill terminated; and, as the defendant was not liable on the bill to prior parties to it, and Judson & Co. could not have set it up against him, he would, but for this judgment against him, have been discharged from all liability in the matter.

Can the prior judgment against the defendant vary this result, considering that the relation between the defendant and Judson & Co. upon the bill was known to the plaintiffs long before they surrendered it to Judson & Co. ? It is proved by one of them, that they knew of this relation, either at the time they received the bill, or shortly before it went to protest,—leaving it doubtful whether they knew that the defendant was surety only for Judson & Co. upon the bill when they took it, or acquired that knowledge afterwards, though before the surrender of it to Judson & Co. This doubt does not strike us as material to the equity of the defendant to have his known rights as surety respected by the plaintiffs. The equity does not arise out of any contract with them, but out of a relation subsisting between the defendant and another party to the bill, which, because known to them, involves an equitable duty towards him, which they can disregard only at their peril. Such appears to have been the view of this equity as stated by Lord Cottenham, in *Hollier* v. *Eyre*, 9 Cl. & Fin. (House of Lords), 1, 45, and by the Lords Justices, in *Davies* v. *Stainbank*, 6 De G. M. & G. 679 ; *Pooley* v. *Harradine*, 7 El. & Blackb. 434–443, where see the doctrine of these cases commented on by Mr. Justice Coleridge ; 3 Leading Cases in Equity, Hare & Wallace's notes, 570–577 ; 2 Am. Lead. Cases, Hare & Wall. notes, 412, where see the cases collected and criticised.

If, too, the equity arises not from contract, but from a knowledge by the plaintiffs' of the defendant's suretyship on the bill, how can their judgment, recovered against the defendant, affect either this relation, or their equitable duty? The relation of the defendant to Judson & Co. is certainly not affected by a judgment to which they are no parties, but is only one step towards the plaintiffs' recovery of the amount of the bill from the defendant, which, when completed by payment, would entitle the defendant to recover back the amount from Judson & Co. Nor do we see why the judgment should absolve the plaintiffs from their equitable duty to the defendant; since it does not take away the knowledge out of which it arises, nor estop him from proving either the relation, or their knowledge of it, or the matter in discharge, subsequent to the judgment, in breach of the duty which these involve. The judgment simply merges, by legal fiction, the cause of action upon which it is founded, to prevent the *same matter* from being again litigated between the same parties. This fiction does not prevent a court of law from looking behind a judgment and taking even *oral* proof, for the equitable purpose of preventing a double recovery for the same cause of action. Why then should it be permitted to shut from the view of a court of equity, and here, therefore, of a court of law, an equity perfectly consistent with it, and matter subsequent, going to the equitable release of it? Had the facts now proved occurred before this judgment was rendered, they would have opposed a good defence to the recovery of it, and if not availed of in defence, the judgment would have concluded them; occurring after the judgment, they are no more concluded by it than payment, or a release, or any other matter going to discharge it. *Carpenter* v. *King*, 9 Metc. 511–517, and notes on same, and cases cited in 2 American Leading Cases, (Hare & Wallace's notes,) 437–451.

In this view of the case, it is of no importance whether the transfer of this judgment from the plaintiffs to Chapman was authorized by Judson & Co.; or if not, by his payment of their debt as their surety to the plaintiffs, and consequent right to demand a transfer of this, with other securities of Judson & Co., held by the plaintiffs as collateral to the same debt. In either case,

as the mere equitable assignee of the judgment, his title could not rise higher than its source; and if, as we have considered, the judgment was extinguished in the hands of Shelton & Tuttle, no title to it existed, and none could be by them conveyed to Chapman.

The facts do not, in our view, support the plea of payment, but should have been pleaded specially as a release; but as the defendant is a surety, we shall permit him to amend his pleadings so as to avail himself of this defence, upon the condition that he shall recover no costs of this action.